Please proceed. Thank you, your honors. Good morning. My name is David Schwartz. I'm here on behalf of the appellant, Janet Mays. We ask for the reversal of the summary judgment granted below because the trial court did not understand and did not appreciate that when a supervisor manipulates a purportedly neutral, gender-neutral lateral movement system to keep out females in a more prestigious, easier, and more preferred job working in the Phoenix area in a climate-controlled van as opposed to out in the heat, that this is a violation of Title VII relating to the terms and conditions of employment. The primary issue in this case is whether or not this is akin essentially to what's been called a subordinate bias claim, cat's paw kind of as it's been described by various courts. We believe that the proper standard was established in Poland v. Chertoff by the Ninth Circuit and is not the standard in Staub. But regardless, it's still our argument we meet both standards. The Poland standard demonstrates that as long as a biased supervisor, subordinate supervisor's actions influence the ultimate decision, that that is correct. Now, let's see. There's no indication that the supervisor talked to the people who handled that system, right? There is no direct evidence of that. No direct evidence of that. That is correct. Now, wait, wait, wait a second. If I understand it the way the system works, if you want to be moved to place A or B or C, I think, you put on your form, I'd like to be moved to place A, B, or C, and then this pretty rigid system just kicks in and says, okay, personal seniority gets to move to A. That's correct. So the one thing she did not do was put down that she wanted to move to place A. She said I'd like B or C, and so other people got to place A before she did. Once she put A on the form, the next one that came up, as far as the evidence shows, and when she was qualified, she got.  So there it is. All she had to put on her form in the first place was A, B, C, and she didn't, correct? Correct. And the company, therefore, has committed discriminatory act because it didn't move her to A when she didn't ask to be moved to A. The problem with that view of the limited facts is it ignores the other facts, and that is that the system itself is broken. That the function was provided to the employees, but it's not accurate. And then more importantly, someone, one of the less senior males, Gerardo Miranda, was transferred instead of my client, the female. He went to the lease circle, your A, if you will, and then immediately, within a month, he was already back at the B that had been requested. So what? He didn't ask, she, he asked for A. He did ask for A, correct? Yes. And she did not, did she? That's correct. But we don't believe that that alone should be the sole guidance, that if the system that people doing the system relied on, and nobody told her she couldn't put A on her form, correct? That's correct. The evidence does say that. Her own supervisor, who she would have been in contact with, I take it, didn't say you can't put A on your form. That's correct. The testimony is that no one told her she couldn't put A, but no one told her she had to put that particular, the A, in your case. And she didn't put A because she thought, oh, well, it's good enough if I put B, I'll get A if I want it. Well, it's not quite as simple as that, but I can understand how you might come to that belief. It's not that simple because the A is one yard lease circle. The other yard that she put down, B, is the pre-chart. They're both supervised by the same supervisor. That's how the rule doesn't say, the rule doesn't say if there's one supervisor over two or three yards, you can put down any one of the yards, does it? The rule says you've got to put the yard down. The rules do not say it in the fashion that you've indicated. Yes, Your Honor, that's correct. And the rule is put down A, and she would have been in as far as the record shows. The problem from our perspective is that the opening at A was actually an opening at B. That's what Mr. Miranda shows us. We see the same thing from John Stewart two years later. Males, what's happening is they're saying, we'll call this opening at A because it keeps the female out. She didn't ask for A. And we'll transfer these males, as soon as they get there, to A, we'll transfer them to B. It's a subterfuge designed to hide the animus. And when that subterfuge was no longer the case, because in 2009, our client did put both A and B, there was no excuse in operating at A. Why did things change in 2009 for your client? Because she was told, you have to put this A down. She put both A and B, and so she did. She wasn't told by the supervisor who was discriminating. She was told by her current copper splicing supervisor. The supervisor was discriminating? I mean, what we're – please identify for me the name of the discriminating supervisor and the evidence which shows that that person had gender bias. The name of the supervisor is not readily available in the record, in the sense that someone specified it was X. But I don't believe that the law requires that X's name be there, as long as X is the place. Now, your second part of your question, which I believe to be a very pertinent question, is what is it tells us about this supervisor X that he was discriminating? We know from the record that the only women that he allowed in the system were at the fiber splicing for the priest or lease circle predated him. We know that, in fact, only males were transferred from 2005, when he took over, until at least – So you're arguing disparate impact is circumstantial evidence of actual discrimination. That's correct. There is no evidence of direct gender discrimination. By one supervisor whose name we still don't know. Well, it could be one of three people, but the record does not allow us to tell which one. And I agree with that, Your Honor. But I don't think that that alone should be dispositive. The failure to actually name that specific – Well, the counsel – Yes, Your Honor. Counsel, can I ask you a question, please? The current supervisor who said that this unnamed prior supervisor was manipulating the system, as I understand it, that testimony did not quite say that the prior supervisor was discriminating based on his sex. I mean, I thought – I read it to say that he's saying her prior supervisor had it out for her and discriminated against her. But where does his testimony say, even if we could accept an unnamed person as adequate, that it's on the basis of sex? I think you refer to Mr. Hecker's affidavit, and I would agree with Your Honor. It does not say the specific reason for the manipulation of the system. The Hecker affidavit was offered to demonstrate that a supervisor, we'll call him X, had the power to manipulate, because one of the employer's arguments was that this field supervisor could not be able to manipulate. The Hecker affidavit addresses that issue, that in fact this X has the power to manipulate, not necessarily that this Mr. Hecker had personal knowledge as to why the supervisor X was active. How is it that supervisor X is manipulating her if she fails to put the Lee circle yarn on her form as her desired transfer spot? It's not manipulating her in the sense what it's doing is knowing that she has asked for priests and knowing she has not asked for Lee circle, it gives him the opportunity to manipulate the system by sending Mr. Miranda ostensibly to Lee circle, this A spot, and then immediately transferring him to B, the priest yard spot. That's the manipulation. That's the problem with the system and why we believe the employer's responsible. It's that manipulation of the system. It's not the actual operation of the system itself, because the system only operates based on the openings that it's told to it, and that's where the problem comes into. That's where the subordinates' bias influences the ultimate decision. Where is the opening? And that's what the trial court failed to understand. We believe that regardless of whether it's a stock standard, which we don't think actually should apply in Title VII cases, either way we believe we meet them. I want to just briefly touch about, in case you're on this, gets to the issue about an adverse employment action. I think the record is pretty clear that working outside in the manholes is what copper splicing was involved. Fiber splicing, in contrast, which involved more training, therefore more prestige and qualifications, was not as dirty, was not as arduous, and is certainly a step up. And if transfer from an arduous, dirtier, less prestigious, I'm sorry, more prestigious job to one which is more arduous, more dirty, less prestigious, is a demotion and therefore an adverse employment action, the converse should be the same.  And on that point, counsel, do you have any case, any published case, from any circuit or published district court saying what you just said, supporting, that the converse is the same? In other words, saying that a failure to transfer someone to a better position, to a position with better working conditions, is an adverse employment action? I'm not able to, off the top of my head, to recall such a case, but, Your Honor, I think it's common sense would tell us that, and if Your Honor would like, I'd be happy to submit a supplemental list of citations for points that would support that argument. Thank you. And unless Your Honors have any more questions right at the moment, I'll reserve my remaining time. All right. Morning, Your Honors. May it please the Court. My name is Jill Chasson. I represent Quest Corporation. Excuse me. Quest is now known as CenturyLink, but I will refer to it as Quest here, because that is the name that's on the case. This is really a straightforward case about an employee who wasn't qualified or, if you prefer, didn't apply for the position she could apply for. She claims she should have been selected for in 2007 through the Lateral Movement Program. And her opposition to summary judgment is based on attempts to avoid that very ineluctable conclusion from the record. The Lateral Movement Program is governed by a local agreement between Quest and the Communication Workers Union, and it governs voluntary transfers to different functions in the same job title or different locations in the same function. And as you know from the record, Ms. Mays was working in the copper splicing function and sought to transfer to the fiber splicing function. It's undisputed that there were two basic qualifications to transfer to open positions. The employee had to be satisfactory in performance and attendance, and the employee has to have a lateral movement request or LMR form on file for the function and the location where the opening exists. And then the openings are filled by seniority from the people who have submitted those requests. And the lateral movement administrator maintains rosters of everyone who has submitted these requests. So relating to the case at Barr, there's a roster for the employees who have requested fiber splicing at Lee Circle. There's a roster for people who have requested fiber splicing at the Priest Yard. There's a roster for people who have requested fiber splicing at 67th Avenue. How do you explain what Mr. Schwartz was pointing out a moment ago, that Mr. Miranda, a less senior employee, applied, I believe, for the Priest Yard and was put in Lee Circle? He applied for both. Oh, he applied for both. Correct. I see. So he had he ‑‑ I can pull the form from the record here if you like, but my recollection is that Mr. Miranda and Mr. West as well both listed fiber splicing at Priest Yard and fiber splicing at Lee Circle separately on their forms. Mr. Barton just put fiber splicing at Lee Circle, but that was obviously sufficient to get him there. And in any event, Mr. Miranda, I would add, going to counsel's point about what happened after the transfer, even if you accept Ms. May's own affidavit testimony on that point, that happened two months after the transfer that was in place. And there's no evidence in the record that his move was voluntary. And what we're talking about here is voluntary movements pursuant to the lateral movement program. So if quest management decided to move him involuntarily two months later, that's really not probative of the issues before you today. The LMR requirement is really the central point in this case because the lateral movement requests are specific to a location. And it's undisputed that up to three positions and locations can be listed on the form. Ms. Mays knew that. She did that. And there were four available locations she could have listed. She only listed the Priest Yard. It's just undisputed. And it's undisputed that the males listed Lee Circle. I don't remember from the record, but who has access to these forms when they're filed? Right. So the employee fills out the form, and it must be signed then by their current supervisor. So at the time for Ms. Mays in 2007, that was Mr. Hecker. So he would have seen her form. But it then goes to the lateral movement administrator. That's Becky Stone and her assistant, Joan Ligon. Once the forms go there, that's where they sit. A confirmation goes back to the employee. But the key here is that Ms. Mays is now claiming on appeal that it was the fiber splicing supervisor, the unnamed fiber splicing supervisor, who manipulated the positions. That person never would have seen the form, only the employee's current supervisor. So in Ms. Mays' case, her copper splicing supervisor. But Mr. Hecker. Correct. Mr. Hecker is the one who gave a favorable affidavit to Ms. Mays. He did. And he didn't say anything about any particular person being discriminatory on the basis of sex. He didn't. He referred to unwanted people. And that's a term that appears repeatedly in the appellant's brief. There's never a reference to taking any action on the basis of gender. And somebody, I suppose, could be unwanted for a whole host of reasons. But there's no reference to gender bias at all. His affidavit, I think, is not credible or competent summary judgment evidence for a number of other reasons, including the fact that he was a copper supervisor and he was not the fiber splicing supervisor. Getting back to your original point, though, about who would have seen them, it would not have been the fiber splicing supervisor that's accused of bias here. That person never would have seen the form. And beyond that, the fiber splicing supervisor would have had to know a number of other things to even make this whole alleged manipulation work. Because there are hundreds of neck techs in the Phoenix area, all of them can submit lateral movement requests. And they all go to the lateral movement administrator. So this supervisor would have no way of knowing who else had submitted for the Lee Circle location, what their seniority was, all things that he would have had to note in order to be able to manipulate the location and exclude misplays. Because ultimately, whether someone is selected depends on where they rank in seniority on the roster of people who have submitted for the relevant location. So unless the fiber splicing supervisor knows how that roster looks, there's just not a feasible way that this manipulation could even have occurred. I understood you a moment ago say that after the LMR was signed by Mr. Hecker, the copper supervisor, it went to a person named Stone and it sat there. It sat there, but no action was taken? Well, when I say they sat there, she is the keeper of the records for those forms. But who is the person who says, who reads the form and says, all right, this applicant is going to go to Lee Yard? That's Ms. Stone's and her assistant, Mr. Ligon. So when they get the forms, they create these rosters, because forms can come in at any time during the year. I mean, it may be months. So neither Stone nor Ligon are what you call a fiber splicing supervisor? They are not. They work in the network operations department. The fiber splicing supervisor is the person who receives the employee off the roster maintained by Stone and Ligon. That's correct. They would get the employee at the back end of the process. Counsel, if I could ask you to touch on a question I asked your opposing counsel. Is there any authority in any circuit court or any district court that says that a failure to transfer someone into a post with better working conditions is an adverse employment action? I believe that we cited some authority in our brief on what I think is not exactly the question you're asking, but the issue is whether a failure to make a lateral transfer could be an adverse action. And in this case, I think we would say there is authority for that, because what we're arguing is that if it's a purely lateral transfer, then the failure to make it is not an adverse action. So if it's not purely lateral, then the failure to make the transfer would be adverse. Here, our position is that it's purely lateral, so there's not an adverse action. And our answering brief does include authority for that proposition. Ms. Chanson, let me take you back to the question I was asking before. You were telling me that Stone and Ligon make the decision as to where the applicant goes to either Priest Yard or Lee Circle. True? They do not decide where the openings are. They are informed by management where the openings are, and then they look at the roster and they start going down the roster. And that the fiber splicing supervisor has no input in that decision. True? That is correct. Now, it's a motion of summary judgment, right? The question is whether it's a tribal issue of fact. Here's the affidavit of Robert Hecker. He says Janet Mays was not treated fairly and was passed up through the job bid process due to the former fiber optic supervisor's ability to change or suggest different locations to keep unwanted people from going to fiber. It sounds to me like there's an issue of there's two versions here. You're giving me one version, and Mr. Hecker is giving me another version. So, Mr. Hecker, first of all, there's no indication how he would know about this unnamed supervisor's ability. Let me ask you this. Did you make a motion to strike this affidavit on the basis of lack of personal knowledge? We did make a motion to strike it. Let's discuss the evidentiary rulings that could have been made and were not made. Why is this not a tribal issue of fact? Well, if you look at the way Mr. Hecker phrases his testimony, first he says he agrees that Janet wasn't treated fairly, which says to me it's not his idea. Someone has suggested that to him. But he accepts the idea. He does. All right. He also, he only refers to unwanted people. And probably the most important, he doesn't refer to gender bias. The other point I would make is it's undisputed that Hecker and any fiber splicing supervisor and any supervisor at that level, they're not involved in making the decision. It's not undisputed. It is undisputed. Mr. Hecker says that the former fiber optic supervisor's ability to change or suggest different locations. So he has some power there. There's an issue of fact. Let's not fight the facts. So let me explain a little bit about how the process for determining the open locations is determined. So first, there's no evidence in the record other than Mr. Hecker's speculation that the supervisor has input on that. But even if he does. What do you mean speculation? He's saying under oath that this situation exists where the former fiber optic supervisor has the ability to change or suggest. I mean, that's a fact, isn't it? It's not. Because, Mr. Hecker, if you assume that the supervisor, let's assume, because there's no evidence in the record, that the supervisor passes up information to the next level of management, it is. Now, all I'm saying is that under rules of summary judgment, we indulge the nonmoving party's evidence with all possible intendance in its favor. True? True. Now, if you take this statement and indulge it as being true to the extent that we can under motion of summary judgment, it creates an issue of fact as to who makes the decision. Ms. Stone, was Mr. Liggins with their little table, or the former fiber optic supervisor, whoever he is, it's a plural, supervisor's ability. So why isn't that a tribal issue of fact in view of what Mr. Schwartz has pointed out, which apparently is a disparate impact theory, which is men went to Lee and women didn't? The reason that it doesn't create a tribal issue of fact is because it's not a reasonable inference to draw that the supervisor had that input. What is undisputed is that the location of the openings is determined not by the supervisor level, but by either the vice president or an area manager. And that varies depending on whether it's a position that's replacing a departing employee or whether it's a new additional position where they got additional funding. So you're saying that Mr. Hecker got it wrong. I am. All right. Why don't we let a jury decide that? Because there's no evidence to dispute that the upper managers actually make the decision. Except for Mr. Hecker. Mr. Hecker is not in a position to know. What I'm not understanding is what does the ability to change different locations mean? It means that the supervisor can say I want somebody at Lee or I want him at Priest? And of course he can do that. I think he can say here's or are you saying the supervisor does not have the ability to pass on information where he needs somebody? The supervisor could do that, but ultimately the supervisor doesn't make the decision. So the supervisor says I want somebody at Priest, let's say, and then the upper management says, fine, you get somebody at Priest. Yes? The upper managers.  Okay. Let's say they say that. Yes. Okay. They agree and say, okay, we'll have an opening at Priest. How does that affect what the people who are handling the transfer do? They look down Priest and find somebody, right? That's correct. But nobody else knows whether the list shows a woman's going to Priest or not. Yes. The only people who know who's on the list. Are Stone. Yes. So I don't understand how this goes anywhere. I'm just not understanding. I don't either, Your Honor. I don't think Mr. Hecker's affidavit creates an issue of fact. Okay. Let me address one other issue. Should Your Honors get past the prima facie stage, which is that summary judgment can be affirmed based on any other basis in the record, and we would submit to you that even if Ms. Mays establishes a prima facie case, she has not put forth the substantial and specific evidence and pretext that would be necessary for her claim to survive. She does not argue in her opening or reply brief that she's done so, so we would submit that argument is waived. And we would therefore urge the Court to affirm summary judgment for Quest. Thank you. Let me address Mr. Chaston's last point. We did argue that there was pretext. In fact, the pretext analysis can, in fact, be based upon the same evidence that is used for the prima facie case. So we've presented all of our evidence. We did not waive and do not agree that there's no evidence of pretext, if Your Honors get to that far point. Most of my argument pretty much was the pretext argument again. The evidence, again, disparate impact, right? Again, disparate impact. Their explanation, in fact, doesn't even address. It's like two ships passing in the night. It does not address our theory of the case, which is that this field supervisor manipulated the system. Their argument is simply we have the system. So all of our evidence actually addresses the pretext argument because it goes to the question of the manipulation for the start of the system. A system which is neutral on its face can be manipulated at the inception. And that's our theory. Breyer. Because it's not coming through clear to me. On your theory, then, the supervisor can say, I've got an opening at Lee or I've got an opening at Priest, right? A or B. But he doesn't know who's on the list for A or B. We don't know that, Your Honor. We don't know that. We don't have any evidence that indicates that anybody but the two folks up there in the main office know who's on the list for A or B. I agree with the general point. We do obviously know the employee and the hacker numbers. But, yes, I agree with your point. Okay. So this guy says, okay, I want to manipulate the system because I sure don't want a woman at B. Okay? So he says, all right. What to himself? I'm going to make the opening at A? What's he going to say to himself? I believe him. He says, I don't want a woman at B. Okay. Now what does he do to manipulate the system? He says the opening is at A. Okay. But he doesn't know whether the roster for A has women or the roster for B has women. He doesn't know who's on the roster for A and B. There's no evidence that he has any knowledge of that. So how does he manipulate that? There is no direct evidence of that, Your Honor. I concede. How does he manipulate it? Tell me. He can still manipulate it. He doesn't know that. He doesn't know. Well, he can still manipulate it. I think your point is how do we know he's done with an intent to discriminate? No, no. I'm not saying that at all. I'm just saying he doesn't know who's on the list. How does he manipulate it? What does he do? The manipulation of the system is there's really an opening at Priest. Mr. Miranda's evidence of that. Okay. So he makes it at A. So instead, Mr. Miranda goes to A, which is Lee. Never mind Mr. Miranda. He doesn't even know Miranda's on the list or what point on the list or who's ahead of Miranda on the list or who's not ahead of Miranda on the list or who's behind him. He doesn't know any of that, according to the evidence. All he knows is I've got an opening at B, but I'm going to put it in A instead. So he manipulates that. Yes. Yes? No. Let me go back to my question. How in the world does he have any idea of whether he's going to wind up horror of horrors with an X at A and he didn't want an X above all offense? How does he know since he doesn't know what's on the list? He presumably would only find out afterwards and do what he did with Mr. Miranda, which is allow him then to go to the opening, which he really wanted to fill, which was that priest. He should have gone to my client. That's manipulating openings, but that's irrelevant to the question of whether he's doing anything that stops a woman or an X from getting to A. I would not necessarily agree because in the sense that I could decide that I only want the women at B. If they're going to be women, I don't want them. But the worst, the lesser of two eagles is send them to B. And then when a man goes there, if I want, I'll decide I'll move him over to A, which is really where I wanted them anyway. And that way I keep women away from A, where I'm located at the time. I've got you over your time, so I'm sorry. But I understand. Okay. Thank you, Your Honors. Thank you very much. And the case of Mays v. Cute West will be submitted. And that ends our calendar for this morning. And we will stand in adjournment until tomorrow morning at 9.30 a.m. Thank you very much. All rise. Committee, hereby offers as is the Honorable United States Court of Appeals the next circuit on the county part. To the support of this session, I'll stand adjourned. Thank you. Thank you. Thank you.
judges: Fernandez, Gould, Bea